# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

BERNICE VALENTIN,

     **Plaintiff,**

     **v.**                            **Case No. 19-CV-1626-SCD**

ANDREW M. SAUL,
**Commissioner of Social Security,**

     **Defendant.**

---

## DECISION AND ORDER

---

Bernice Valentin applied for Social Security benefits in 2013, alleging that she is disabled based on various physical and mental impairments. Following a hearing, an administrative law judge (ALJ) determined that Valentin became disabled when she turned fifty years old but that before then she remained capable of working notwithstanding her impairments. Valentin now seeks judicial review of that decision, arguing that the ALJ erred in evaluating her alleged symptoms, weighing the medical opinion evidence, and failing to account for all her limitations. The Commissioner contends that the ALJ did not commit an error of law in reaching his decision and that the decision is otherwise supported by substantial evidence. I agree with the Commissioner; accordingly, his decision will be affirmed.

## BACKGROUND

Valentin was born in Chicago on October 8, 1967. R. 40, 379.[1] She grew up in

---

[1] The transcript is filed on the docket at ECF No. 10-3 to ECF No. 10-33.

Milwaukee, graduating from Riverside High School in 1985. R. 379, 1665. From 1998 to 2001, Valentin worked at a bank as a business analyst. R. 41, 174. She started feeling depressed after being laid off from that job and her fiancé began using drugs. R. 381–82. Eventually she found a new job working at a hospital as a learning analyst, and she obtained a bachelor's degree in communication management and technology. R. 174, 166. In 2006, however, Valentin was diagnosed with fibromyalgia, and she began feeling tired and having problems focusing at work. R. 41–42. She was put on probation, transferred to a temporary position, and laid off altogether in 2009 when her temporary project was eliminated. *Id.* A few months later, Valentin got a job doing secretarial tasks at a church, but she was unable to keep up with the work and missed a lot of days due to worsening migraine headaches, depression, and fibromyalgia pain. R. 42, 50, 174, 365. Around that time, she also began experiencing panic attacks, especially while driving. R. 381. Valentin quit the secretarial job on August 16, 2013, after her employer refused her request to work part-time. R. 42, 173. She hasn't looked for work since then. R. 43.

In November 2013, Valentin applied for disability insurance benefits from the Social Security Administration (SSA), alleging that she became disabled on August 16, 2013 (when she was forty-five years old), her last day of work. R. 148–55.[2] Valentin asserted that she was unable to work due to the following medical conditions: fibromyalgia, major depression, chronic fatigue, anxiety, temporomandibular joint disorder (TMJ), migraine headaches, asthma, high blood pressure, and allergies. R. 173. After her applications were denied at the local level, R. 63–92, Valentin requested an administrative hearing before an ALJ, R. 105–06.

---

[2] The ALJ indicated that Valentin also applied for supplemental security income, *see* R. 14, but there is no evidence of that claim in the record.

2

Valentin, along with her attorney, appeared in person before ALJ Brent Bedwell on January 12, 2017. R. 35–62. Valentin testified that her impairments caused difficulty concentrating and remembering and chronic pain in her neck, shoulders, legs, and hands. R. 43–44. She also reported getting migraines once or twice per week—during which she would lie down in a dark room for several hours—and suffering from anxiety and depression. R. 44–46, 50. Valentin indicated that she takes medication for her various impairments, which "helps [her] get up and at least take a shower and do some things," but they also make her very sleepy. R. 44–45. When asked about her daily activities, Valentin responded, "I do some of that stuff but it's less of it, less time doing." R. 47. For example, it takes her more time to sew, read, and cook. Valentin testified that three or four times per month, her pain flares up, and she is unable to do much of anything for a couple of days. R. 51.

The ALJ also heard testimony from Jacquelyn Wenkman, an impartial vocational expert (VE). *See* R. 54–60. Wenkman testified that Valentin had three past relevant jobs: business analyst (performed at the light exertional level), trainer and trainee development (light), and secretary (sedentary). R. 56. According to Wenkman, a hypothetical person with Valentin's age, education, and work experience could not perform any of her past jobs if she were limited to a restricted range of unskilled sedentary work, but she could work as an office worker or an order clerk. R. 56–57.

Applying the standard five-step process, *see* 20 C.F.R. § 404.1520(a)(4), on April 12, 2017, the ALJ issued a written decision concluding that Valentin was not disabled. *See* R. 11–34. Valentin requested review of the ALJ's decision by the SSA's Appeals Council. R. 144–47. On February 27, 2018, the Appeals Council denied Valentin's request for review, R. 1–6, making the ALJ's decision the final decision of the Commissioner of Social Security, *see*

3

*Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016). Thereafter, Valentin sought judicial review of the Commissioner's decision under 42 U.S.C. § 405(g). R. 1044–45. Pursuant to a stipulation, the district court remanded the matter to the Commissioner for further proceedings. *See* R. 994–1002.

On remand, the Appeals Council vacated the ALJ's April 2017 decision and sent the matter back to the ALJ for further consideration of the step-five finding. R. 1003–08. Valentin appeared via video before the ALJ for another hearing on April 2, 2019. *See* R. 966–93. She testified that her symptoms were more or less the same as they were at the last hearing. R. 974–81. She still had difficulties with attention and concentration, and she was getting two to three migraine headaches per week that required her to lie down for several hours each time. R. 981–83. Valentin also reported experiencing symptom flares at least once per month, and sometimes weekly during the spring and winter, during which her pain is so bad that she spends the entire day lying down and she's "very emotional." R. 983–84. Valentin indicated that she could sit for about fifteen minutes before she needed to stand up and stretch for five to ten minutes, stand in place for five to ten minutes, and walk about one block. R. 984–85.

The ALJ also heard testimony from Bob Hammond, another VE. R. 985–92. According to Hammond, a hypothetical person with Valentin's age, education, and work experience could work as a circuit board screener and a semiconductor bonder if she were limited to a restricted range of unskilled sedentary work. R. 987–90. However, all work would be precluded if that person required two unscheduled breaks per workday or was excessively absent from work (defined as one day per month after a ninety-day probationary period and no more than ten days in a twelve-month period). R. 990. Hammond further testified that no employer would tolerate an employee needing to lie down for at least one hour during each

4

workday, that employers would tolerate an employee being off task at most ten percent of the productivity rate, that an employee could not perform the circuit board screener job or the semiconductor job if she were limited to only occasional bilateral handling and fingering, and that no employer would tolerate an employee who needed extra supervision on a daily basis. R. 991–92.

On May 21, 2019, the ALJ issued a partially favorable decision. R. 938–65. The ALJ determined that Valentin had not engaged in substantial gainful activity since August 16, 2013, her alleged onset date. R. 945. The ALJ found that Valentin's impairments (fibromyalgia, headaches, depression, and anxiety) limited her ability to work but didn't meet or equal the severity of a presumptively disabling impairment. R. 945–46. The ALJ next determined that Valentin had the residual functional capacity (RFC) to perform sedentary work with the following additional limitations and allowances:

- She must be allowed to change positions between sitting and standing every 30 minutes, for a few minutes, before returning to sitting or standing;
- She is limited to jobs that are unskilled and involve simple and routine instructions and tasks;
- She is limited to jobs having only occasional decision making and changes in work setting;
- She must avoid exposure to extreme heat and cold, noisy/loud work environments, and irritants such as fumes, odors, dusts, and gases;
- She is unable to climb ladders, ropes, and scaffolds;
- She can do only occasional stooping, crouching, kneeling, crawling, and climbing of ramps and stairs; and
- She can have only occasional interaction with the public, coworkers, and supervisors.

R. 946–47.

In assessing her RFC, the ALJ did not fully credit Valentin's allegations about the severity of her impairments. R. 947–52. As for the medical opinion evidence, the ALJ gave

5

"partial weight" to the opinions of the non-examining state-agency medical consultants; "partial weight" to the opinions of Valentin's treating psychologist, Brian M. Lukach, PhD; "little weight" to the opinions of Valentin's therapist, Maren C. Erickson, LCSW; "partial weight" to the opinions of Valentin's psychologist, Lori Greer, PsyD; "little weight" to the opinions of Valentin's treating provider, Bre Anna Nagle, MD; and "little weight" to the opinions of Valentin's treating nurse, Patricia Michels, APNP. R. 952–54. The ALJ determined that, in light of the above RFC, Valentin could not perform any of her past relevant jobs, but she could work as a circuit board screener and a semiconductor bonder. R. 955–56. However, based on the Medical-Vocational Guidelines, Valentin became disabled on October 7, 2017, the day before she turned fifty years old. R. 956–57. Valentin filed written exceptions to the unfavorable portion of the ALJ's May 2019 decision; that decision became final and appealable after the Appeals Council declined to assume jurisdiction. *See* R. 925–28; *see also* 20 C.F.R. §§ 404.955, 404.984.

Valentin filed this action on November 5, 2019. ECF No. 1. The matter was reassigned to me in April 2020 after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 15, 17. The matter is fully briefed and ready for disposition. *See* ECF Nos. 11, 18, 19.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

6

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing

*Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Valentin contends the ALJ erred in (1) evaluating the intensity, persistence, and limiting effects of her alleged symptoms, (2) weighing the medical opinion evidence, and (3) failing to account for all her limitations in the RFC assessment.

## I. The ALJ's Evaluation of Valentin's Alleged Symptoms

Valentin first argues that the ALJ improperly discounted her subjective allegations of disabling symptoms. *See* ECF No. 11 at 11–18. ALJs use a two-step process for evaluating a claimant's impairment-related symptoms. *See* Social Security Ruling (SSR) 16-3p, 2016 SSR LEXIS 4, at *3 (Mar. 16, 2016). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." *Id.* at *9. "In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an

8

individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *9–10.

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Id.* "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

The ALJ here determined that Valentin's "subjective allegations about the disabling nature of her impairments are not reasonably consistent with the evidence of record and do not correspond with the level of treatment she has received or required." R. 952. According to the ALJ, "the objective medical evidence does not support the degree of either physical or mental limitation alleged," as Valentin's mental-status examinations were generally normal, her treatment for fibromyalgia and emotional conditions was "relatively conservative," and the record showed some improvement with treatment. R. 951–52. The ALJ also found that, "in spite of her impairments and alleged functional limitations, [Valentin] has remained fairly active." R. 951. As support, the ALJ cited activities Valentin reported in her function report and fatigue questionnaire, as well as statements she made during various treatment visits. *See* R. 951–52. Also, the ALJ noted that there was "a situational component to [Valentin's]

9

emotional issues, with symptomatic exacerbation often occurring in conjunction with increased stressors related to . . . lack of employment/income, relationship issues, and chronic pain." R. 952.

Valentin maintains that the ALJ misconstrued the record when evaluating her subjective allegations and disregarded the variable nature of her symptoms. She first takes issue with the ALJ's recitation of her mental-status exams, asserting that the ALJ ignored findings showing Valentin to be distressed, depressed, anxious, and emotionally fatigued. *See* ECF No. 11 at 12–13.

While the ALJ's description of Valentin's mental-status exams tended to emphasize the "normal findings"—e.g., alert and oriented to person, place, and time; good intellectual ability; no memory or cognitive deficits; good insight and judgment; and intact thought content—the ALJ did not overlook Valentin's mental-health symptoms. The ALJ determined at step two that Valentin's depression and anxiety constituted severe impairments. *See* R. 945. The ALJ also noted that Valentin "has complained of symptoms often associated with depressive and/or anxiety-related conditions including anhedonia, variable energy, emotional lability, tearfulness, easy frustration and irritation, increased worry, feeling overwhelmed, reduced ability to handle stress, decreased memory and concentration, sleep disturbance, feelings of guilt and worthlessness, social withdrawal, and feelings of panic." R. 948. And the ALJ described times when Valentin presented with these symptoms. *See* R. 949 (citing Exhibit 5F [R. 379–84], Exhibit 18F [R. 737–55]), Exhibit 23F [R. 1229–34]); R. 950–51 (citing Exhibit 39F [R. 1664–69]). The ALJ reasonably determined that, notwithstanding Valentin's mental-health symptoms, the "generally good mental functioning" observed upon

examination demonstrated that those symptoms were not as disabling as she alleged. *See* R. 948, 951–52. This finding has adequate support in the record.

Valentin next accuses the ALJ of "cherry-picking" the record when he determined that her mental-health conditions and physical symptoms improved with treatment. As support, Valentin cites a number of treatment notes that purportedly substantiate the variability in her symptoms. *See* ECF No. 11 at 14–15. Although at times Valentin presented with escalating emotional or physical issues, *see, e.g.*, R. 614, 646, 661, 668, 669, 674, 675, 701, 703–04, 719–20, 731, 746, 747, 751–55, the ALJ reasonably determined that the extreme limitations claimed by Valentin conflicted with reports of *some* improvement with treatment from 2016 to 2018. The ALJ noted that in March 2016, Valentin said she felt that Cymbalta had helped with her mood. R. 951 (citing Exhibit 12F [R. 455–564]). The ALJ also noted "[t]he records provided by Dr. Lukach consistently referencing improvement in mood, level of activity, and functioning." R. 951 (citing Exhibits 18F [R. 737–55], 23F [R. 1229–34]). For example, in August 2016, Valentin indicated that her pain "improved about 50% over time" with yoga and the use of Gabapentin, R. 751; in December 2016, Valentin estimated "that she is about 75% better now compared to how she was feeling and functioning 5 years ago when she would be in bed for 3–4 days at a time," R. 1233; and in February 2017, Dr. Lukach noted that Valentin "continues to maintain an improved mood and an increased level of activity given her limitations due to her medical problems," R. 1231. Also, the ALJ noted that Valentin testified that medication helped somewhat with her mental-health symptoms. R. 951, 975 ("I take Cymbalta at night and then I also take a dose in the morning which helps."). Moreover, earlier in the decision, the ALJ discussed the mental-status evaluation conducted by Kurt Weber, PhD, whose report indicated that Valentin's "mental conditions were 'fairly well controlled'

11

as of April 2018." R. 950 (citing Exhibit 39F [R. 1664–70]); *see* R. 1489 ("Overall, her [mental-health] symptoms have been fairly well controlled with duloxetine."). This evidence supports the ALJ's finding that, with treatment, Valentin was not as functionally limited as she alleged; the ALJ didn't ignore Valentin's symptoms or find that treatment made her symptom-free.

Next, Valentin challenges the ALJ's description of her reported activities. According to Valentin, the ALJ selectively emphasized those activities that supported his conclusion that Valentin remained fairly active despite her impairments, while ignoring limitations that detracted from that finding. For example, the ALJ purportedly overlooked Valentin's reports about how stress and anxiety impacted her cognitive functioning, it took her longer to do many activities due to pain and stiffness, she needed reminders and had difficulty paying attention, she was easily fatigued, and her ability to perform arts and crafts had diminished as a result of her conditions. *See* ECF No. 11 at 15–16.

The ALJ reasonably determined that Valentin's reported activities were inconsistent with her allegedly disabling symptoms, notwithstanding any difficulties she claimed to have with such activities. The ALJ discussed at length the activities Valentin reported in her function report and fatigue questionnaire, as well as the statements she made to treatment providers about her functional abilities. *See* R. 951–52 (citing Exhibits 4E [R. 189–99], 7E [R. 208–10], 5F [R. 379–84], 12F/100 [R. 554], 19F/138 [R. 893], 39F [R. 1664–70]). Although the ALJ didn't specifically mention every qualification Valentin made, he wasn't required to, and the decision reflects that he generally considered Valentin's claimed functional limitations. For example, the ALJ noted that Valentin reported in the fatigue questionnaire "that she was able sweep, do dishes, make lunch, and shower, *but that she did those things in short increments*," R. 951 (emphasis added); that in September 2016, Valentin "reported

12

difficulty driving, walking, and climbing stairs," *id.*; that Valentin testified "that she continues to manage her activities of daily living as reported in her Function Report, *but for a shorter duration and that she is slower than in the past*," R. 951–52 (emphasis added); and that in July 2018, Valentin reported to Dr. Weber that she "regularly did *some* housework and cooking" and that she was capable of "shopping for food *within the parameters allowed by her physical condition*," R. 952 (emphasis added). Moreover, the ALJ explicitly said that, "[v]iewed in total, these activities are representative of functional abilities greater than the degree of debilitation alleged in application materials and at the hearing." R. 952. The ALJ's consideration of Valentin's reported activities therefore was not based on a one-sided view of the evidence.

Valentin also contends that the ALJ's observation that there was a situational component to Valentin's emotional issues bolstered rather than detracted from her claimed inability to work due to mental-health issues. *See* ECF No. 11 at 17. I see no error in the ALJ noting that Valentin's mental impairments appeared to be affected by situational stressors. For one, this factor did not appear to heavily influence the ALJ's evaluation of Valentin's alleged symptoms. To the extent it did, the ALJ reasonably determined that Valentin's emotional issues were exacerbated by her lack of employment/income, relationship issues, and chronic pain. R. 952. That finding is supported by substantial evidence in the record. *See, e.g.*, R. 643, 644, 661, 675, 677, 678, 701, 719, 749. Given this evidence, the ALJ reasonably inferred that Valentin's emotional issues would not be disabling if she could get those other areas of her life under control.

Finally, Valentin maintains that the ALJ erred in discounting her alleged symptoms based on her allegedly conservative treatment. She notes that no doctors ever suggested more aggressive treatment that she refused to try and that inpatient hospitalizations are not required

13

for a mental impairment to be functionally disabling. Valentine accuses the ALJ of impermissibly "playing doctor" by suggesting that she would have undergone additional treatment if she were as limited as alleged. *See* ECF No. 11 at 17–18.

I see no error in the ALJ's characterization of Valentin's treatment for fibromyalgia and her emotional conditions. Like the situational component to Valentin's mental-health issues, it appears that this was not a deciding factor in the ALJ's subjective-symptom evaluation. Although the ALJ indicated that Valentin's treatment was "relatively conservative" when summarizing his findings, the substantive portion of his decision focused on the objective medical evidence—including Valentin's unremarkable mental-status exams and reported improvement with treatment—and Valentin's reported activities. *See* R. 947–52. The ALJ did not, as Valentine intimates, impermissibly play doctor or suggest that her impairments would have required surgical intervention (or some other aggressive course of treatment) if her allegations were to be believed.

In sum, Valentin has failed to demonstrate that the ALJ's decision to discredit some of her alleged physical and mental symptoms lacks explanation or support in the record. I therefore find no error in the ALJ's decision to not fully credit Valentin's complaints of disabling symptoms.

## II.    The ALJ's Evaluation of the Medical Opinion Evidence

Valentin next argues that the ALJ erred in weighing the opinions of three treating providers: Dr. Lukach, her psychologist; Erickson, her therapist; and Dr. Nagle, her family doctor. *See* ECF No. 11 at 23–26.

### A. Dr. Lukach

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)); *see also* SSR 96-2p, 1996 SSR LEXIS 9, at *1–4 (July 2, 1996). An opinion that is not entitled to controlling weight need not be rejected. Instead, the opinion is entitled to deference, and the ALJ must weigh it using several factors, including the length, nature, and extent of the claimant's relationship with the treating physician; the frequency of examination; whether the opinion is supported by relevant evidence; the opinion's consistency with the record as a whole; and whether the physician is a specialist. *See* 20 C.F.R. § 404.1527(c); *see also Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1087 (E.D. Wis. 2009). Moreover, the ALJ must always give "good reasons" to support the weight he ultimately assigns to the treating physician's opinion. *See* § 404.1527(c); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Only "the most patently erroneous reasons for discounting a treating physician's assessment" require reversal. *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010) (citing *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)).

Valentin began seeing Dr. Lukach in August 2016. *See* R. 752–55. Following the initial psychological evaluation, Dr. Lukach diagnosed her with pain disorder (associated with psychological and physical factors), anxiety disorder (not otherwise specified), and major depressive disorder (recurrent, in partial remission). R. 755. On October 11, 2016, Dr. Lukach completed a medical source statement in support of Valentin's disability claim. R. 565–68. Dr. Lukach indicated that Valentin exhibited chronic fatigue that required her to take daily

15

two-hour naps and to lie down for about fifteen minutes after doing most types of work tasks (e.g., vacuuming, cooking, cleaning, etc.). R. 565. Dr. Lukach further indicated that, if required to work in close proximity to others, Valentin would likely withdraw from work tasks and respond inappropriately to criticism from supervisors. R. 565–66. According to Dr. Lukach, Valentin would miss more than four days of work per month due to symptoms or treatment, would be unable to leave her house less than one day per month (on top of the other four days) due to panic attacks, and would need two to three unscheduled breaks each workday. R. 566. With respect to Valentin's ability to sustain attention, concentration, persistence, and pace and complete tasks, Dr. Lukach indicated that Valentin would be off task twenty percent of the workday, would be less than fifty percent as efficient as the average worker, would be unable to perform work that involved detailed (i.e., more than simple, one- to two-step) work tasks, and would require extra supervision no more than twice per workweek. R. 567. Dr. Lukach indicated that Valentin had a "moderate" limitation in activities of daily living, a "mild" limitation in social functioning, and a "moderate" limitation in concentration, persistence, or pace. R. 568. Dr. Lukach also indicated that even a minimal increase in mental demands or change in environment worsens Valentin's depression and anxiety and that Valentin's medications caused drowsiness and impaired attention/concentration. *Id.*

The ALJ assigned partial weight to Dr. Lukach's "Part B" criteria limitations—i.e., activities of daily living; social functioning; and concentration, persistence, or pace—but little weight to his other opinions. R. 952–53. According to the ALJ, the degree of functional limitation cited in Dr. Lukach's more extreme opinions was unsupported by and inconsistent with the evidence in the record, was speculative, and was "with little basis." R. 953. For

16

example, the ALJ noted that Valentin "attended numerous medical, mental health, and therapy appointments . . . without a significant number of cancellations or no-shows." *Id.* (citing Exhibits 2F [R. 347–7], 4F [R. 376–78], 5F [R. 379–84], 9F–12F [R. 399–564], 14F–19F [R. 570–924]). The ALJ further noted that Valentin's mental-status exams, including those performed by Dr. Lukach, "were generally good" and that Dr. Lukach did not document any impairments in attention or concentration in his treatment notes. R. 953 (citing Exhibit 18F/9 [R. 745]). Also, the ALJ determined that Dr. Lukach's opinion regarding difficulties interacting with others was inconsistent with his own report, wherein Valentin "described her personality as funny and outgoing, and she stated that she liked to be around other people and draw energy from them." R. 953 (citing Exhibit 18F/18 [R. 754]).

Valentin takes issue with the reasons the ALJ gave for rejecting Dr. Lukach's opinions. She repeats her complaint about the ALJ cherry-picking the record with respect to her mental-status exams and reported activities. Valentin also asserts that her "ability to attend doctors' appointments on a weekly or monthly basis for a limited amount of time is hardly analogous to an employee's attendance at a full-time job" and that the ALJ failed to build an accurate and logical bridge between this evidence and his conclusion. *See* ECF No. 11 at 25.

The ALJ provided good reasons to support the weight he assigned to Dr. Lukach's opinions. *First*, the ALJ reasonably determined that Dr. Lukach's opinions were inconsistent with his own treatment notes. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.") For example, the mental-status exam from the date of Dr. Lukach's medical source statement revealed that Valentin was distressed with a depressed mood and a stable affect with decreased range and increased intensity, but was otherwise normal: oriented to person, place,

17

and time; pleasant and cooperative; speech is fluent, coherent, and with a regular rate and rhythm; thought process is linear, organized, and goal-directed; no signs of suicidal thinking, homicidal ideation, or auditory/visual hallucinations; good insight and judgment; and grossly intact memory and cognition. R. 745. The other mental-status exams revealed similar findings. *See* R. 739, 741, 743, 747, 749, 754, 1231, 1233. The ALJ accurately noted that these exams did not document any impairments in attention or concentration, and the ALJ did not ignore any significant abnormal findings upon examination. Likewise, the ALJ accurately noted that Dr. Lukach's opinion about social withdrawal was inconsistent with Valentin's statement to him that she "likes to be around other people and draw energy from them." R. 754.

*Second*, the ALJ reasonably determined that Dr. Lukach's opinions were inconsistent with Valentin's own statements about her functioning. In March 2016, Valentin told her treating nurse that she "feels Cymbalta has helped with her mood." R. 474. Similarly, during her treatment with Dr. Lukach, Valentin consistently reported improved pain, improved mood, and increased activity. *See* R. 751 ("Since her pain started, it has improved about 50% over time."), 1231 ("She continues to maintain an improved mood and an increased level of activity given her limitations due to her medical problems."), 1233 ("Patient estimates that she is about 75% better now compared to how she was feeling and functioning 5 years ago when she would be in bed for 3–4 days at a time.").

*Finally*, the ALJ reasonably determined that Dr. Lukach's opinion about absenteeism conflicted with Valentin's history of keeping her scheduled appointments. Dr. Lukach opined that Valentin would miss more than four days of work per month due to fatigue, tiredness, pain, concentration problems, and medical appointments and that Valentin may also be

18

unable to independently leave her house an additional day as a result of her low tolerance for stress. R. 566. If true, one would expect to see a significant number of missed or cancelled appointments. But as the ALJ accurately noted, the record did not reference many, if at all, after Valentin's alleged onset of disability. The ALJ did not suggest that Valentin's ability to attend her medical appointments demonstrated an ability to work full-time on a consistent basis.

### B. Erickson

Valentin has seen Erickson for psychological counseling since August 2012. *See* R. 177, 615–731. On February 19, 2015, Erickson completed a medical source statement that contained opinions substantially similar to those rendered by Dr. Lukach. *See* R. 395–98. The ALJ assigned little weight to Erickson's opinions, finding her conclusions (especially with regard to expected absences, off-task behavior, and the need for unscheduled breaks) unsupported by and inconsistent with the evidence in the record, including Valentin's own reported activities. R. 953–54. The ALJ noted that Valentin's mental-status exams had "generally been good." *Id.* Moreover, according to the ALJ, the extreme limitations opined by Erickson were inconsistent with the contemporaneous treatment notes of Valentin's psychiatrist, Kenneth Johnson, MD. For example, in April 2015—less than two months after Erickson authored her opinions—"Dr. Johnson noted [Valentin's] mood was 'reasonably stable with some mild depression.'" *Id.* (citing Exhibit 10F/4, 5 [R. 415, 416]).

Valentin challenges the reasons the ALJ gave for rejecting Erickson's opinions. *See* ECF No. 11 at 24–25. However, her argument simply repeats the same objection discussed above regarding the ALJ's reliance on mental-status exams and reported activities. Those reasons were good enough to support the weight attributable to Dr. Lukach's opinions; the same is

true with respect to Erickson's opinions. But the ALJ provided an additional reason for rejecting Erickson's opinions—inconsistency with Dr. Johnson's contemporaneous treatment notes—that is unchallenged here. Valentin therefore has not demonstrated that the ALJ erred in weighing Erickson's opinions.

### C. Dr. Nagle

In April 2018, Dr. Nagle (Valentin's family doctor) completed a medical assessment form in which he opined (among other things) that Valentin would be off task fifteen percent of the workday, could sit and stand for twenty minutes at a time, respectively, would exhibit impairment-related absenteeism about four days per month, and has headaches once or twice per month that require her to lie down for two to three hours each time. R. 1447–51. The ALJ assigned little weight to Dr. Nagle's opinions "because they relied too heavily upon [Valentin's] self-reports . . . and were not supported by the totality of the evidence, including the objective observations from a same day appointment." R. 954. The ALJ further pointed out that Dr. Nagle noted in her records that Valentin "was fairly new to her practice, having previously been seen on only three occasions." R. 954 (citing Exhibits 32F [R. 1447–51]; 33F/37–39 [R. 1488–90]; 38F [R. 1658–63]).

Valentin maintains that the ALJ's weighing of Dr. Nagle's opinion is not supported by substantial evidence, as "the ALJ tends to ignore evidence that detracts from his conclusions throughout his opinion." *See* ECF No. 11 at 12. I disagree. Dr. Nagle acknowledged that "all responses [in the assessment] were reported by [the] patient," R. 1451 and that at the time she completed the assessment she had a limited treatment relationship with Valentin, R. 1488 ("Bernice is fairly new to my practice. I have seen her on 3 occasions."). Also, Dr. Nagle's treatment notes from the day she completed the assessment did not substantiate the extreme

20

opinions contained therein. *See* R. 1488–90. Those are three good reasons for discrediting the opinions of a treating source.

***

Accordingly, Valentin has not demonstrated that the ALJ erred in weighing the medical opinion evidence.

## III. The ALJ's RFC Assessment

Lastly, Valentin argues that the ALJ's RFC assessment is incomplete because it does not account for the variable nature of her symptoms or her upper-extremity limitations. According to Valentin, the ALJ ignored her fluctuating mental-health symptoms, functional limitations, and pain. Valentin asserts that the ALJ also overlooked her cervical impairment, which required surgery in November 2018 and (in Valentin's view) likely explains the source of her neck pain and radiating symptoms in her arms, hands, and fingers. Valentin maintains that these errors are material, as her variable functioning impacted her ability to do work on a regular and continuing basis, and the VE testified that all work would be precluded if Valentin was only occasionally able to handle and finger bilaterally. *See* ECF No. 11 at 18–23.

Valentin has not demonstrated that the ALJ erred in formulating his RFC. "In this circuit, 'both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record.'" *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (quoting *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014)). The ALJ adequately accounted for any variability in Valentin's reported symptoms. Throughout the decision, the ALJ explicitly noted that Valentin complained about fibromyalgia flares, variable mental-health symptoms, and having good and bad days. R. 947 ("With regard to fibromyalgia, the claimant described flares occurring more than once a

21

month and associated with changes in the weather or periods of increased activity."), 948 (noting complaints of "variable energy" and "emotional lability"), 950 (noting "problems concentrating *on more days than not*, . . . being bothered by low energy and feeling of worthlessness and guilt *on some days*, [and] . . . being bothered by a sense of feeling nervous, anxious, or on edge *on more days than not*") (emphasis added). However, the ALJ reasonably determined that Valentin's statements concerning the extreme variability in her symptoms was not persuasive in light of the objective medical evidence and Valentin's reported activities. *See* R. 951–51; *see also supra* section **I.** Likewise, the ALJ reasonably assigned little weight to treating provider opinions that arguably contained limitations to account for Valentin's variable symptoms. *See* R. 952–54; *see also supra* section **II.**

The ALJ also reasonably did not include any upper-extremity limitations in the RFC assessment. Valentin speculates, without any supporting evidence, that her cervical impairment—which was diagnosed in August 2018, after she was found to be disabled, *see* R. 1295–96—affected her RFC during the relevant time period (i.e., from her alleged onset date in August 2013 until her fiftieth birthday in October 2017). To the extent Valentin complained about upper-extremity issues during that period, the ALJ considered Valentin's complaints and reasonably found that they were not as disabling as alleged. *See* R. 947 (acknowledging that Valentin testified she "drops things more frequently, likes to use a pillow to prop her arms up while reading, and can only crochet for 5–10 minutes at a time"), 948 (noting that Valentin has complained about "upper extremity radiation and numbness"). Moreover, Valentin's allegations were not corroborated by any medical providers: Dr. Nagle (Valentin's family doctor) indicated that Valentin could "constantly" handle, finger, and reach, R. 1449; Michels (Valentin's treating nurse) left blank the same section on her assessment form, R. 1409; and

22

the state-agency medical consultants opined that Valentin did not suffer from any manipulative limitations, R. 72, 87. Valentin therefore has failed to demonstrate that her upper-extremity limitations were supported by the medical record.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ did not commit reversible error in evaluating Valentin's alleged symptoms, weighing the opinions of her treating providers, or formulating her RFC. Thus, the Commissioner's decision is **AFFIRMED**. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 11th day of September, 2020.

STEPHEN C. DRIES
United States Magistrate Judge

Case 2:19-cv-01626-SCD   Filed 09/11/20   Page 23 of 23   Document 20